**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IGNACIO PULIDO,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:17-cv-0884 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(G)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF IGNACIO PULIDO AND AGAINST DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Ignacio Pulido asserts he is entitled to a period of disability and disability insurance benefits, under Title II of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the medical record and seeks judicial review of the decision to deny his application for benefits. Because the ALJ failed to apply the proper legal standards, as discussed below, the administrative decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**PROCEDURAL HISTORY**

On March 20, 2013, Plaintiff filed an application for benefits, alleging disability beginning February 1, 2011. (Doc. 13-6 at 2) The Social Security Administration denied the applications at both the initial level and upon reconsideration. (*See generally* Doc. 13-4) After requesting a hearing, Plaintiff testified before an ALJ on January 21, 2016. (Doc. 10-3 at 30, 43) The ALJ found Plaintiff

1

was not disabled as defined by the Social Security Act, and issued an order denying benefits on February 18, 2016. (*Id.* at 30-36) Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied the request on May 1, 2017. (*Id.* at 2-5) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## **ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.    Relevant Medical Evidence**[1]

In 2004, Plaintiff was diagnosed with acute myelogenous leukemia, which was treated with chemotherapy. (Doc. 13-9 at 2, 12) In August 2004, a bone marrow biopsy showed "no evidence of residual/recurrent promyelocytic leukemia either by morphology or by immunophenotyping." (*Id.* at 9) Plaintiff was placed on maintenance chemotherapy, "which he completed in 2006…[and] has been in complete remission ever since." (*Id.* at 38)

In November 2010, Dr. John Bonner reviewed Plaintiff's medical record related to a prior application for benefits. (Doc. 13-9 at 12) Dr. Bonner noted Plaintiff's lab results were stable and he continued to be "in complete remission," though Plaintiff reported he had fatigue, headaches, difficulty concentrating, "difficulty completing tasks [due to] weakness," left ankle pain, and left shoulder pain. (*Id.* at 12-13) He determined the medical record did not show "limiting physical findings," and there was no evidence that Plaintiff's "headaches [were] distracting or limiting." (*Id.* at 13) Dr. Bonner concluded Plaintiff did not have a severe physical impairment. (*Id.*) Dr. Richard Betcher agreed Plaintiff's impairments were "nonsevere" on March 28, 2011. (Doc. 13-9 at 54)

In January 2012, Plaintiff had a checkup with Dr. Robert Levy. (Doc. 13-10 at 8) Dr. Levy

---

[1] The Court's analysis below focuses upon Plaintiff's physical residual functional capacity. Thus, while the Court has reviewed the entirety of the record, this summary of the medical evidence focuses upon the objective evidence and clinical findings related to Plaintiff's physical impairments.

3

noted Plaintiff was "doing well" and "really has not had any new problems." (*Id.*) Dr. Levy noted that Plaintiff reported he did "not feel that strong, but he [was] not really working or doing anything." (*Id.*) Dr. Levy opined Plaintiff was "doing okay clinically," but noted he had "some chronic symptoms," such as sinus problems and headaches, which could not be addressed by the Valley Cancer Medical Group. (*Id.* at 8-9)

On February 12, 2013, Plaintiff reported that he had headaches and was experiencing fatigue and weakness. (Doc. 13-9 at 58) Later that month, Dr. Levy evaluate Plaintiff at the Valley Cancer Medical Group. (Doc. 13-10 at 6) Dr. Levy noted Plaintiff had not been seen for a while and was "doing pretty good overall." (*Id.*) Dr. Levy indicated Plaintiff was treated for an infection recently, which was treated with antibiotics. (*Id.*) Plaintiff reported he "still does not feel that good, but he cannot work and does not have disability and still feels a bit … anxious, some tingling in various places at times.' (*Id.*) Dr. Levy indicated he could "[]not say there [was] any sign of leukemia." (*Id.* at 7) According to Dr. Levy, Plaintiff's continued fatigue was "quite possible (sic) from the leukemia and the previous therapy." (*Id.*)

In March 2013, Plaintiff told Dr. Levy that he was "doing okay," though he had "some aching all over." (Doc. 13-10 at 5) Dr. Levy noted Plaintiff was taking ibuprofen, which Plaintiff said helped "a little bit" for pain to his left hip and leg. (*Id.*) Dr. Levy gave Plaintiff a prescription for Vicodin, and indicated Plaintiff should have an "evaluation for the bone and joint pain" by his primary care doctor. (*Id.*) He opined Plaintiff's blood work "looked good," and there was "[n]o evidence for leukemia." (*Id.*)

On June 3, 2013, Dr. David Braverman completed a case analysis related to Plaintiff's Social Security application, and noted Plaintiff "allege[d] weakness all the time with no energy." (Doc. 10-13 at 25) Dr. Braverman indicated he did not have medical evidence, and requested that a consultative examination and lab work be obtained. (*Id.*)

On June 10, 2013, Plaintiff stated he was "doing okay," though he had experienced "some nausea" and gastrointestinal discomfort. (Doc. 13-10 at 3) He told Dr. Levy that he was not taking any medication, and did not have any new symptoms. (*Id.*) Dr. Levy opined Plaintiff was "doing pretty well clinically." (*Id.* at 4) He did not know what the gastrointestinal issues were related to, and

4

indicated Plaintiff "may need scopes and other studies done." (*Id.*) Later that month, Plaintiff visited Livingston Medical Group, where he saw Jesus Corral, PA. (*Id.* at 51-53) Mr. Corral found Plaintiff did not exhibit abdominal distention or tenderness. (*Id.* at 52) Mr. Corral determined that Plaintiff had a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (*Id.* at 53) Mr. Corral ordered lab work, and "educated [Plaintiff] about his diet." (*Id.*)

Dr. Harold Keairnes completed a case analysis related to Plaintiff's Social Security application on July 1, 2013. (Doc. 13-4 at 8) He indicated that he reviewed available records from Livingston Community Health and Valley Cancer Group that were dated through June 2013. (*Id.*) Dr. Keairnes found "no medical evidence of physical limitations from the acute myelogenous leukemia in remission nor any other chronic health problem." (*Id.*) Dr. Keairnes concluded Plaintiff's "leukemia in remission is considered to be non-severe." (*Id.*)

In September 2013, Plaintiff told Dr. Levy that he was "doing so-so," with "some pain in the left neck as well as some pain in the left foot going up in the leg into the thigh at times." (Doc. 13-10 at 46) Plaintiff said his primary care physician prescribed medication for it, though he could not recall what he was taking. (*Id.*) Dr. Levy observed that Plaintiff did not exhibit "particular tenderness or erythema, or swelling" in his left leg. (*Id.*) He recommended that Plaintiff "be seen by [an] orthopedist and/or neurosurgeon and [have] appropriate x-rays," because Plaintiff's complaints with his left leg had "been going on for a while." (*Id.* at 47)

On October 22, 2013, Plaintiff had an appointment with Mr. Corral regarding "chronic neck pain," and feeling that he had "a disc-out of place, [with] pain radiated to the left should off and on" for two weeks. (Doc. 13-10 at 57) Upon examination, Mr. Corral noted Plaintiff was "[p]ositive for: [n]eck pain," though he found no "joint swelling and muscle weakness." (*Id.* at 58) He ordered an MRI of Plaintiff's cervical spine, which was taken on October 23, 2013. (Doc. 13-10 at 59, 81) Dr. Michael Dumars determined that Plaintiff had "[d]egenerative disc disease of C3-4 through C6-7 with broad-based posterior disc bulges and minimal mass effect upon the cord and mild segmental narrowing." (*Id.* at 82) Dr. Dumars opined Plaintiff also had "mild foraminal narrowing at the C3-4 and C4-5 levels." (*Id.*) Further, he found Plaintiff had a "[s]mall central and left paracentral disc protrusion at C6-7." (*Id.*)

Dr. Roy Brown completed a case analysis on December 2, 2013, while Plaintiff's application was pending reconsideration. (Doc. 13-4 at 15-16) The Social Security Administration indicated there was no new medical evidence related to Plaintiff's treatment for his review. (*Id.* at 15) Dr. Brown opined Plaintiff's last medical evaluation "showed some mild [symptoms]" but his physical examination was within normal limits. (*Id.* at 16) Dr. Brown affirmed the decision from Dr. Keairnes at the initial level, finding that Plaintiff's condition was non-severe. (*Id.*)

In January 2014, Plaintiff continued to report neck pain and stiffness. (Doc. 13-10 at 60) According to Mr. Corral, Plaintiff exhibited tenderness in his cervical spine, and a "mildly reduced" range of motion on examination. (*Id.*)

Plaintiff told Dr. Levy in March 2014 that he was "not doing too well" because he had a "lot of neck and shoulder pain." (Doc. 13-10 at 44) Plaintiff indicated he would follow up with an orthopedist regarding the pain. (*Id.*) According to Dr. Levy, Plaintiff had "[n]o definite hematological problems." (*Id.* at 45) Dr. Levy noted: "Unfortunately, he is having a lot of neck and other symptoms. I do not feel like he is able to work. Further discussed this and [he] may need to see a neurosurgical, although it is not clear if anything [can] be done about the neck." (*Id.*)

The following month, Dr. Levy noted Plaintiff had an MRI on his cervical spine, which he found showed "some degenerative changes and other changes." (Doc. 13-10 at 43) Plaintiff reported he was "having a lot of headaches, neck pain, [and] cannot really do much exercise." (*Id.*) Although Plaintiff tried taking Norco, he said it "made him not feel good," and caused "some nausea." (*Id.*) Dr. Levy prescribed Plaintiff Zofran to help with the nausea. (*Id.*) He noted Plaintiff brought some "disability forms" related to "how much activity he can do standing, sitting, walking, etc." but Dr. Levy felt he "really could not fill this out." (*Id.*) He indicated Plaintiff would "probably have to have this filled [out] by the orthopedist and neurosurgeon he sees." (*Id.*)

In July 2014, Plaintiff told Mr. Corral that he had been experiencing fatigue for two weeks. (Doc. 10-13 at 62) Mr. Corral determined that Plaintiff continued to exhibit tenderness in the cervical spine. (*Id.* at 63) He also found Plaintiff had "mild pain [with] motion." (*Id.*) Mr. Corral indicated that Plaintiff would receive a ketorolac tromethamine injection and norflex injection. (*Id.* at 64)

Dr. William Pistel completed the disability questionnaire on September 16, 2014. (Doc. 13-10

at 48) He noted Plaintiff previously had a rotator cuff tendon tear, and was "status post left shoulder arthroscopy rotator cuff repair and acromioplasty." (*Id.*) Dr. Pistel opined Plaintiff should not lift and carry any weight, and was "totally temporarily disabled." (*Id.* at 48, 49) Dr. Pistel indicated that he believed Plaintiff would be temporarily disabled through October 22, 2014. (*Id.*)

On November 25, 2014, Plaintiff told Dr. Levy that he was "feeling so-so" and "doing okay in general." (Doc. 13-10 at 41) Dr. Levy noted Plaintiff also reported he still felt tired and had headaches "as he always does." (*Id.*) Dr. Levy opined Plaintiff "seem[ed] to be doing well, but unfortunately he [was] still pretty symptomatic." (*Id.* at 42) He noted: "I wish his symptoms would improve, but it is hard to say what [they are] specifically due to and what to do about them. They might still be related to treatment for the leukemia." (*Id.*)

In April 2015, Plaintiff returned to see Mr. Corral, reporting that a week before, he began having left neck and shoulder pain. (Doc. 13-10 at 68) Mr. Corral again noted Plaintiff had a "mildly reduced" range of motion with his cervical spine. (*Id.* at 69) He indicated that Plaintiff was educated about the degeneration of his cervical spine and the "progressive chronic condition." (*Id.* at 70)

In June 2015, Plaintiff reported he was "not doing all that well," and still had "a lot of aches and pains, [including] his headaches and pain in various joints and muscles." (Doc. 13-10 at 39) Dr. Levy noted Plaintiff saw a doctor at Livingston Medical Clinic and received prescriptions for diclofenac and cyclobenzaprine, which Plaintiff said provided "only a little relief." (*Id.*) Dr. Levy found no evidence of a recurrence of leukemia, and no need to perform a bone marrow biopsy. (*Id.* at 40) Dr. Levy again prescribed Norco to Plaintiff, and "discussed the side effects of nonsteroidals with him." (*Id.*)

Plaintiff had a follow-up with Mr. Corral regarding his back pain in August 2015. (Doc. 13-10 at 72) Mr. Corral noted Plaintiff described the severity as "mild," but "[t]he problem [was] changing in character." (*Id.*) Upon examination, Mr. Corral determined Plaintiff's thoracic spine and lumbar spine were normal. (*Id.* at 74) However, Plaintiff had "mild pain [with] motion" and tenderness in the cervical spine. (*Id.*)

In January 2016, Plaintiff continued to report back pain, saying his problem was "worsening." (Doc. 13-10 at 76) He described the pain "an ache, dull, localized, and sharp;" stating it was a "2" in severity. (*Id.*) Mr. Corral determined Plaintiff exhibited tenderness in the lumbar spine. (*Id.*)

B.  **Administrative Hearing Testimony**

Plaintiff appeared before an ALJ on January 21, 2016. (Doc. 13-3 at 42-43) At the hearing, Jeffrey Milam, Plaintiff's counsel, reported that records had been requested from Livingston Medical Group that had not been received. (*Id.* at 44) Mr. Milam indicated the medical records were ordered and he should have them "within a week." (*Id.*) The ALJ indicated the record would be held open for a couple weeks to be sure the documents were received. (*Id.*) The exhibits, including the medical records of Exhibits 1F through 13F, were then admitted into the record. (*Id.* at 45)

Plaintiff testified that he lived in a house with his family. (Doc. 13-3 at 46) He said he was able to do some household chores, including cleaning, fixing meals for his children and "a little bit" of yard work. (*Id.* at 47) In addition, Plaintiff said he would go shopping at attend church. (*Id.*) On a typical day, Plaintiff would "take [his] kids to school, …do a little household chores, [and] go visit [his] mom." (*Id.*) He also said that he would nap, listen to "[a] little bit of music and … watch TV a bit." (*Id.* at 48) Plaintiff explained that when he did activities such as washing dishes, sweeping, or washing clothes, he would "have to take breaks" because he would get tired. (*Id.* at 55)

The ALJ noted Plaintiff had been "on disability before for [his] leukemia," which was then in remission, and asked Plaintiff to describe how he felt as of the hearing. (Doc. 13-3 at 49) In response, Plaintiff stated he felt "very tired," and did not "feel like doing anything." (*Id.*) In addition, Plaintiff said he had pain in his neck and back, which he attributed to a fall when he was working prior to being diagnosed with leukemia. (*Id.*) Plaintiff testified that he had pain "all the time," which it was worse in the morning. (*Id.* at 50)

Plaintiff reported that he could not be "in a static position because it really hurts." (Doc. 13-3 at 51) He estimated he could stand for 15 minutes before he needed to sit, and sit for "[m]aybe a half hour, 45 minutes" before he needed to stand. (*Id.* at 51, 57) Plaintiff said he could not walk a lot because he felt "really tired… [and] weak," and estimated he could walk four blocks. (*Id.*) Plaintiff explained that he got cramps in his leg if he stood too long. (*Id.* at 54) He believed the aches and pains in his body were "a result of the chemotherapy and it [had not] gone away yet." (*Id.*)

He reported that he could lift and carry "[m]aybe five, ten pounds," and had difficulty lifting his left arm over his head. (Doc. 13-3 at 51-52) Plaintiff stated he still had a "little" pain in his left

shoulder after the surgery. (*Id.* at 52) He testified the shoulder pain extended up into his neck and worsened if he used his arm a lot. (*Id.* at 52-53)

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff had not engaged in substantial gainful activity after the alleged onset date of February 1, 2011. (Doc. 13-3 at 32) At step two, the ALJ found Plaintiff "has the following severe impairments: acute myelogenous leukemia in clinical remission, cervical degenerative disc disease, and left shoulder status-post rotator cuff repair." (*Id.*) At step three, the ALJ opined these impairments did not meet or medically equal a listed impairment. (*Id.* at 32-33) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently, stand and walk 6 to 8 hours, and sit 6 to 8 hours in an 8-hour workday. He can occasionally reach overhead with the left upper extremity.

(*Id.* at 33) With this residual functional capacity, the ALJ determined Plaintiff was "unable to perform any past relevant work." (*Id.* at 35) However, at step five, the ALJ found Plaintiff could perform "jobs that exist in significant numbers in the national economy." (*Id.*) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 35-36)

## DISCUSSION AND ANALYSIS

Plaintiff contends the ALJ erred in determining his residual functional capacity ("RFC"), asserting the ALJ's findings are unsupported, because "[t]he ALJ did not accept any of the medical opinions in the record in assessing Plaintiff's residual functional capacity." (Doc. 22 at 9; *see also id.* at 8-11) On the other hand, Defendant argues that "substantial evidence supports the ALJ's RFC finding." (Doc. 23 at 9, emphasis omitted)

**A.     The Residual Functional Capacity**

A claimant's residual functional capacity is "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(c) (defining an RFC as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs"). In formulating a RFC, the ALJ weighs medical and other source opinions, as well as the claimant's credibility. *See, e.g., Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226 (9th Cir. 2009). Further, the ALJ must consider "all

of [a claimant's] medically determinable impairments"—whether severe or not—when assessing a RFC. 20 C.F.R. §§ 405.1545(a)(2), 416.945(a)(2).

Examining the medical evidence, the ALJ explained the weight given to the opinions in the medical record as follows:

> On September 16, 2014, William Pistel, M.D., submitted a questionnaire indicating the claimant was totally temporarily disabled from September 17, 2014 through October 22, 2014, due to left shoulder status-post rotator cuff repair (Exhibit 14F). Under Social Security Ruling (SSR) 96-5p, a finding of disability is an issue specifically reserved for the Commissioner. Nevertheless, in making my decision, I still considered the opinion of Dr. Pistel and gave it little weight because it is only for a one month period. Accordingly, the opinion appears to be more of an accommodation as opposed to being based on clinical findings. In addition, the opinion is inconsistent with physical examinations showing normal range of motion of all extremities (Exhibits 13 F, pp. 1, 3 and 15F, pp. 13, 19)
>
> On July 1, 2013, Stage agency consultant, Harold Keairnes, M.D., opined the claimant does not have a severe physical impairment (Exhibit 4A, p. 4). Upon reconsideration, another consultant, Roy C. Brown, M.D., affirmed the prior opinion (Exhibit 6A, p. 5). I give limited weight to the State agency consultant's (sic) opinions because evidence received at the hearing level supports finding acute myelogenous leukemia in clinical remission, cervical degenerative disc disease, and left shoulder status-post rotator cuff repair, as severe impairments (Exhibits 9F; 14F and 15F, p. 31). Therefore, I found them to be severe and limited the claimant accordingly.

(Doc. 13-3 at 34) Plaintiff contends the ALJ erred in assessing the RFC in this manner, particularly in light of the cervical MRI results, which were obtained after Drs. Keairnes and Brown gave their opinions. (*See* Doc. 22 at 9-11) Plaintiff contends that the ALJ erred because she "apparently reviewed the MRI and translated it into functional limitations on her own." (*Id.* at 10)

Defendant argues that Plaintiff's argument fails because "[t]he RFC is an administrative decision, not a medical one." (Doc. 23 at 9, citing 20 C.F.R. § 404.1527(e)(2) (emphasis omitted). Defendant observes that the Ninth Circuit determined "it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." (*Id.*, quoting *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001)) Thus, Defendant asserts the ALJ did not was "not required to rely on a single medical opinion in order to formulate the RFC," and may synthesize multiple opinions, relying on them even though the ALJ did not agree 100% with any one opinion." (*Id.* at 9-10, emphasis omitted).

Notably, none of the physicians who offered opinions reviewed the results of the MRI dated October 23, 2013, which showed "[d]egenerative disc disease of C3-4 through C6-7 with broad-based

10

posterior disc bulges and minimal mass effect upon the cord and mild segmental narrowing," "mild foraminal narrowing at the C3-4 and C4-5 levels," and a "[s]mall central and left paracentral disc protrusion at C6-7." (*See* Doc. 13-10 at 82) Likewise, because records from Livingston Medical Group were received after the hearing with the ALJ, none of the doctors had the opportunity to review the treatment notes from Mr. Corral. (*See* Doc. Doc. 13-3 at 44-45; Doc. 13-4 at 8 [indicating the records reviewed by Dr. Kearines were dated only through June 2013]; Doc. 13-4 at 48 [noting no additional records were received or reviewed by Dr. Brown]). These treatment notes included repeated clinical findings that Plaintiff exhibited tenderness and a reduced range of motion in his spine. (*See, e.g.*, Doc. 13-10 at 60, 63, 72, 76) Evidently, the ALJ reviewed these findings and concluded Plaintiff could perform light work with a reaching limitation.

Because no physician reviewed the MRI results or the clinical findings from the examinations after June 2013, the ALJ clearly rendered her own medical findings that Plaintiff could perform light work with the reaching limitation. However, it is well-settled law that an ALJ may not render her own medical opinion and is not empowered to independently assess clinical findings. *See, e.g., Tackett v. Apfel*, 180 F.3d 1094, 1102-03 (9th Cir. 1999) (holding an ALJ erred in rejecting physicians' opinions and rendering his own medical opinion); *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion, and he must not succumb to the temptation to play doctor and make his own independent medical findings"); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (as a lay person, the ALJ is "simply not qualified to interpret raw medical data in functional terms"). "When an ALJ rejects all medical opinions in favor of his own, a finding that the RFC is supported by substantial evidence is less likely." *See Stairs v. Astrue*, 2011 WL 318330, at *12 (E.D. Cal. Feb.1, 2011). For example, this Court determined an ALJ erred where all medical opinions were rejected before the ALJ formulated the RFC. *See Perez v. Comm'r of Soc. Sec.*, 2018 WL 721399 (E.D. Cal. Feb. 6, 2018).

In *Perez*, a physician concluded after a consultative examination that the claimant "had no functional restrictions", and two non-examining physicians opined the claimant "had no severe physical impairments. *Id.*, 2018 WL 721399 at *6. The ALJ "gave no weight" to these opinions, finding the record indicated the claimant had some limitations. *Id.* "After rejecting all the doctor's opinions, the

11

ALJ concluded that Plaintiff would be capable of a reduced range of light work with postural manipulative and environmental restrictions." *Id.* The Court found the ALJ erred, explaining:

> A claimant's residual functional capacity is not a medical opinion, but is an issue to be decided by the ALJ. 20 C.F.R. §§ 404.1527(d)(2), 416.920(d)(2). However, the finding must be supported by substantial evidence in the record and the ALJ must explain his reasoning behind the RFC. 42 U.S.C. § 405(b); 20 C.F.R. §§ 404.1520c, 416.920c.
>
> Here, the ALJ stated that the RFC was supported by the weight of the objective evidence and Plaintiff's less than credible testimony. But the Court is unable to determine how the ALJ arrived at the conclusion that Plaintiff was capable of light work. Absent adequate explanation of the record, without specific support from a medical source, and with no testimony from a medical expert, the ALJ appears to have defined his own limitations for Plaintiff. The Court finds that this was error. *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (the ALJ was not qualified as a medical expert and therefore could not permissibly go outside the record to consult medical textbooks for purpose of making his own assessment of the claimant's physical condition); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person,... the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

*Id.,* 2018 WL 721399 at *7-8. Without the support of a physician's opinion, the Court concluded the RFC lacked the support of substantial evidence. *Id.* at *8.

Significantly, the RFC finding in *Perez* informs this case. Here, the ALJ indicated she gave "little weight" to the opinions offered, rejecting the findings that Plaintiff did not have a severe impairment, noting the additional medical evidence showed cervical degenerative disc disease and left shoulder status-post rotator cuff repair, which the ALJ determined were severe physical impairments. (Doc. 13-3 at 34) Likewise, she opined the record established Plaintiff's leukemia in clinical remission was a severe impairment. (*Id.*) However, the Court is unable to determine why the ALJ believed a restriction to light work was appropriate, or why the ALJ found Plaintiff "occasionally reach overhead with the left upper extremity." (*See id.* at 26) There simply is no evidence to support these conclusions. Without medical opinions to support the ALJ's conclusions, the RFC lacks the support of substantial evidence. *See Perez,* 2018 WL 721399 at *7-8; *Perez v. Sec'y of Health & Human Servs.*, 958 F.2d 445, 446 (1st Cir. 1991) (holding "the ALJ's conclusions are not supported by substantial evidence" if an RFC is formulated without the findings of a physician). Thus, the ALJ erred in evaluating the record and assessing Plaintiff's RFC.

12

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v*, 80 F.3d at 1292. In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Here, the RFC articulated by the ALJ lacks the support of substantial evidence in the record, and the matter should be remanded for further consideration. *See Tackett*, 180 F.3d at 1102-03 (remanding the matter to the Social Security Administration for reconsideration after finding the ALJ erred by offering his own medical conclusion, which was not supported by any medical evidence); *Perez*, 958 F.2d at 446 (finding that where the ALJ offered any opinion "without any assessment of residual functional capacity by a physician, …it is necessary to remand for the taking of further functional evidence").

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in her evaluation of Plaintiff's RFC and failed to apply the correct legal standards. Consequently, the ALJ's decision cannot be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate regarding Plaintiff's physical RFC, it offers no findings on the remaining issues raised by Plaintiff in his opening brief.

///

///

Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Ignacio Pulido and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **October 2, 2018**  **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE

14